23 C.C.P.A.(Patents)

## McKEE v. STEVENS.

### Patent Appeal No. 3526.

Court of Customs and Patent Appeals.
Nov. 25, 1935.

Fred Gerlach and Norman H. Gerlach, both of Chicago, Ill., for appellant.

Kwis, Hudson & Kent and A. J. Hudson, all of Cleveland, Ohio, for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

The present proceeding is an appeal from the decision of the Board of Appeals of the United States Patent Office in an interference proceeding, awarding priority to the appellee, Stevens. The appellant, Garnet W. McKee, filed his application in said office on May 7, 1930, seeking a patent upon an improvement in meter connecting devices. The appellee, Charles W. Stevens, filed an application for a patent for a similar invention in said office on March 19, 1930.

The counts of the interference were five in number. The first count is deemed to be sufficient for purposes of illustration, and is as follows: "1. Means for spacing the two service pipes of a meter comprising a rigid one-piece bar having at one end thereof means for engaging one of the service pipes and having at the other end thereof a conical opening forming a seat, a conical sleeve to fit in said seat and rotatably mounted therein, said sleeve having a screw thread in its larger end for connection with the other service pipe and a screw thread for connection with the meter pipe."

The Examiner of Interferences, after the interference had been redeclared, and after the parties had taken testimony, held that the burden of proof was upon McKee, as the junior party. It appearing that the junior party had abandoned counts 2, 4, and 5 of the interference, priority was awarded to Stevens as to said counts. No appeal has been prosecuted to this court as to the same. The only issues of the interference relate to counts 1 and 3.

The Examiner of Interferences further held that the party Stevens had conceived and reduced the invention defined in said

counts to practice "at least by October 1929."

The Examiner further held that there was evidence as to the party McKee having conceived and constructed some of the devices the subject of the interference in June, 1928, but that there was no evidence sufficient to show that he reduced the invention to practice at that time; that the evidence introduced by him as to the testing of the device was insufficient to prove reduction to practice; that "at the time" Stevens entered the field, McKee was not shown to have been exercising diligence, and that, therefore, the appellant was not entitled to priority, which was awarded to the party Stevens.

The Board of Appeals followed much the same line of reasoning. It came to the conclusion that it was "satisfactorily established that McKee did conceive a structure within the terms of counts 1 and 3 in June, 1928, and that one or two connector bars corresponding to the same counts were made shortly thereafter." However, the Board was of opinion that this device was not so tested as to constitute reduction to practice, and that, therefore, the invention was not complete. The Board was also of the opinion that in view of McKee's delays until 1930, before filing his application, his work in 1928 constituted merely an abandoned experiment, and that if this could not be so considered, then McKee was shown by the record to have shown an intention to suppress this particular construction. Therefore, priority was awarded to the party Stevens.

The issues are simple, and not difficult to determine. Considerable testimony was taken by the parties as to their activity during the period involved in producing this invention. McKee was connected with the Eclipse Fuel Engineering Company, of Rockford, Ill., and Lake Geneva, Wis., as the engineer of the company. His company, in June, 1928, was engaged in the sale of connectors for gas meters. During June, 1928, the company was making and selling a type of connector with a cylindrical sleeve union outlet. This was a straight sleeve. At that time, McKee conceived and disclosed the subject-matter of the issue here; namely, a tapered sleeve construction for these meter connectors. In this conception and disclosure, he is sustained by the testimony of several of those who worked with him in the Eclipse Fuel Engineering Company, and there seems to be no doubt that he has proved conception at that time. It is further shown that, shortly after this time, at least one of these connectors was made according to the directions of McKee. The witness Statler, who was a machinist in the Eclipse Fuel Engineering plant, states that before delivering the connector with the tapered sleeve and nut connection on the bottom, to one Olsen, manager of the company, he, Statler, tested the new connector; the testimony being as follows:

"Q. 31. Before delivering that bar with the tapered sleeve and nut on the bottom to Mr. Olsen did you make any tests? A. Yes. All gas fittings are tested. First for leaks and then for machine accuracy.

"Q. 32. What was the result of that test? A. Apparently there were no leaks and the machine work was all right, because it was accepted by Mr. Olsen as being O. K."

The witness Olsen testified:

"Q. 29. What was done with the meter bar which was made by Mr. Statler and delivered to you which embodied the tapered bushing? A. It was examined and tested by me."

There is no further testimony in the record as to what further, if anything, was done as to the testing of this device by McKee. On the one hand it is argued by McKee that the test was sufficient to constitute reduction to practice; that this device was of simple character, and that it did not require a test by use under actual working conditions. On the other hand, it is contended by the appellee, and was so held by the tribunals below, that a test in actual use was required. Upon this feature, the result of the case largely depends. If such evidence is sufficient to prove a proper test, then the invention of McKee seems to have been reduced to practice prior to the date of Stevens' entry into the field. On the other hand, if it does not prove reduction to practice, other questions as to the actions and diligence of McKee must be considered.

The burden of proof was upon the appellant McKee to establish that he had reduced the invention to practice, if he is to be awarded priority on the ground that he conceived and reduced the invention to practice before Stevens entered the field.

If this was a device which required a test under actual working conditions to

reduce it to practice, then the burden was also upon McKee to establish that it was so tested. We are inclined to the belief that he did not maintain this burden. To prove by the testimony of witnesses that a device was tested does not prove that it was tested under usual working conditions. It is argued by counsel for McKee that he did not need to do so because, on the strength of Brydle v. Honigbaum, 54 F. (2d) 147, 19 C.C.P.A.(Patents) 773, if a device was a familiar one, and had been long known to the art, a simple modification thereof need not be necessarily tested under actual working conditions. It is not shown, however, by the testimony, that the use of sleeves in these connecting devices was well known in the art prior to June, 1928, nor does it appear that McKee was so conversant with the use of such connectors, at that time, that he might be said to come within the rule of the decision in the case of Brydle v. Honigbaum, supra. Certainly, there is nothing in the record to show that the use of tapered sleeves and conical-shaped connections was known at that time, or that persons working on the device were able to test the same without trial thereof under usual working conditions. It would have been a comparatively easy thing for McKee to attach his connector to a meter in operation, and to have thus tested the connector. We may assume, however, in the absence of proof to the contrary, that this was not done, and that some shop tests only were applied, the nature and sufficiency of which are not disclosed, and that McKee chose to rest the matter on this. An inventor intent upon securing the benefit of his invention ought not to disregard such necessary precautions. If he does so, it is at his own peril. The nature of the device in issue here, coupled with its use in connection with inflammable and poisonous gases, seems to the court to plainly indicate that it should have been tested in such a way as to show that it would operate successfully under actual working conditions. It is not of the simple character of the device in question in the case of Olson v. Thompson, 77 F.(2d) 104, 22 C.C.P.A.(Patents) 1212, where lock washers were involved, and Sachs v. Wadsworth, 48 F.(2d) 928, 18 C.C.P.A.(Patents) 1284, where a lid to a switch box was in issue. This subject is exhaustively discussed by us in Payne v. Hurley, 71 F.(2d) 208, 21 C.C.P.A.(Patents) 1144, followed by Urschel v. Crawford, 73 F.(2d) 510, 22 C.C.

P.A.(Patents) 727, and further discussion here is deemed unnecessary.

It being the conclusion of the court that there has been a failure to prove a sufficient test of the device in 1928, and no other proof of reduction to practice prior to the filing of Stevens' application being offered by the appellant, it follows that appellant must establish diligence on his part during the period from just prior to appellee's entry into the field to the date of appellant's filing, to be entitled to an award of priority.

The appellee Stevens was the vice president and general manager of the Lattimer-Stevens Company, of Columbus, Ohio, a company which was engaged in the manufacture of gas meter connections, stopcocks, and supplies, during the year 1928, and following. It seems, from the testimony, that Stevens conceived the invention involved here in the first part of August, 1928, and that disclosure to others was made during the same year. By the fall of 1929, several orders of considerable size had been taken by this company for the tapered sleeve connection, and the product was commercialized and fully advertised to the trade. From that time until the filing of Stevens' application in March, 1930, production was continued and many orders filled. Whether the appellant, McKee, was advised of the commercialization of this product is not shown by the record. However, it was not until May, 1930, that the appellant filed his application for a patent, several months after the Stevens' product was for sale on the market. After producing his samples in June, 1928, the record does not show any activity on the part of McKee. Evidently neither he nor his company were making any attempt to commercialize this tapered union construction during 1928 or 1929. McKee's company made no effort to produce any tapered plugs on a commercial scale prior to the fall of 1929; the reason therefor being given by the witness Olsen, as follows:

"Q. 61. When did you first have occasion to make any meter bars with tapered plugs on a commercial scale? A. In the year 1929.

"Q. 62. Prior to that was there any demand for a bar with a tapered plug? A. We had learned of no demand for them prior to that time."

On cross-examination, the witness Olsen, in giving a further reason why the

tapered sleeve construction was not pressed, stated: "We wanted to make the bar shown on Exhibit 1 and not the bar with the tapered sleeves."

The bar known as Exhibit 1 was the old straight sleeve connector.

While we are not prepared to agree that this record shows a concealment and suppression of McKee's invention under the doctrine announced in Mason v. Hepburn, 13 App.D.C. 86, we are in agreement with the conclusion of the Patent Office tribunals that McKee has not established what he must establish to be successful here, namely, diligence during the critical period from immediately prior to the date of Stevens' entry into the field to his date of filing. This being our conclusion, he cannot be awarded priority.

The decision of the Board of Appeals is, therefore, affirmed.

Affirmed.

BLAND, Associate Judge (concurring).

I concur in the above conclusion, for the reason assigned by the Board, that upon the record what McKee did amounted only to an abandoned experiment.